WILLIAM W. WARREN *et al.*, d/b/a Hickory Shores Resort, Plaintiffs-Appellants, v. JAMES K. DARNELL *et al.*, Defendants-Appellees.

Fifth District   No. 5—87—0013

Opinion filed December 9, 1987.—Rehearing denied January 8, 1988.

Patrick J. Hitpas and T. Fritz Levenhagen, both of Patrick J. Hitpas, P.C., of Carlyle, for appellants.

Douglas Marti, of Greenville, for appellee Margaret R. Darnell.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiffs, William and Halleck Warren, filed a small claims action against defendants, James and Margaret Darnell, in the circuit court of Clinton County to recover monies allegedly owed by defendants under a contract for the sale of a membership in Hickory Shores Resort. Defendant Margaret Darnell denied that she was indebted to plaintiffs. She also brought a counterclaim in which she asserted that the contract violated section 226.8(b)(7) of Federal Reserve Board Regulation Z (12 C.F.R. §226.8(b)(7), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982)) promulgated pursuant to the Federal Truth in Lending Act (15 U.S.C.A. §1601 *et seq.* (West 1982)). On Margaret's motion, the circuit court granted summary judgment in her favor on that counterclaim,

awarding her $1,000 plus costs and attorney fees of $6,861.36. Plaintiffs unsuccessfully moved to vacate this award and the order granting summary judgment. In denying their motion, the court made a written finding that there was "no just reason for delaying appeal." (See 107 Ill. 2d R. 304(a).) This appeal followed. We affirm.

■■ ■ When a motion for summary judgment is presented, the task of the court "is not to resolve a disputed factual question, but rather to determine whether one exists." (*Puttman v. May Excavating Co.* (1987), 118 Ill. 2d 107, 112, 514 N.E.2d 188, 190.) The pleadings, affidavits, depositions and admissions on file must be construed strictly against the moving party and liberally in favor of the opponent. (*Miller v. Smith* (1985), 137 Ill. App. 3d 192, 196, 484 N.E.2d 492, 496.) Summary judgment is proper if these materials establish that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).

The materials submitted to the circuit court here showed that on September 27, 1980, defendants executed a document denominated as a "Contract for Sale" under which they agreed to purchase from plaintiffs a membership in Hickory Shores Resort. The sale was made on credit under the following terms:

1. Cash Price: $5,195
2. Cash Down Payment: $495
3. Unpaid Balance of Cash Price and Amount Financed (1-2): $4,700
4. Finance Charge: $2,388.64
5. Amount of Note (3+4): $7,088.64
6. Deferred Payment Price (1+4): $7,583.64
7. Amount of Payment: $73.84
8. Number of Payments: 96
9. Total of Payments (7x8): $7,088.64
10. Annual Percentage Rate: 11%
11. Late Charge Per Delinquent Payment: $5.00

These terms were set out in tabular form on the face of the contract and were purportedly provided "in compliance with the Federal Truth-in-Lending Act." The contract also specified, *inter alia,* that the "finance charge is imposed as of the date of this Contract" and that defendants had "the right to prepay the outstanding balance of this Contract in whole or part at any time without penalty."

Defendants paid the $495 cash down payment specified in the contract and made 20 additional monthly payments of $73.84 each month during the 20-month period following execution of the contract. After March 6, 1982, however, no further payments were tendered. Approxi-

mately two years later, on March 15, 1984, plaintiffs brought their small claims action in the circuit court of Clinton County. In that action, plaintiffs sought recovery of $1,550.94.

Defendants initially moved to dismiss plaintiffs' small claims complaint for failure to state a cause of action. Before this motion was argued, however, defendants' attorneys were granted leave to withdraw. Thereafter, defendant Margaret Darnell secured different counsel. Through her new attorney, Margaret filed an answer in which she denied owing any money to plaintiffs. She also filed a counterclaim which alleged that the contract in question failed "to identify the method of computing any unearned portion of the finance charge in the event of prepayment of the obligation" and therefore violated section 226.8(b)(7) of Federal Reserve Board Regulation Z (12 C.F.R. §26.8(b)(7), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982)), promulgated pursuant to the Federal Truth in Lending Act (15 U.S.C. 1601 *et seq.* (West 1982)). For this violation, Margaret requested statutory damages and an award of her reasonable attorney fees under 15 U.S.C.A. §1640(a) (West 1982).

Plaintiffs moved to dismiss the counterclaim, and Margaret, in turn, filed a motion for summary judgment on that counterclaim. Plaintiffs' motion was denied. Margaret then amended her summary judgment motion, and plaintiffs filed a response to the counterclaim in which they raised four affirmative defenses. First, they contended that the counterclaim was barred by the applicable statute of limitations. Second, they alleged that the contract for sale did not, in fact, violate Federal law. Third, they argued that by using her membership in Hickory Shores Resort and by failing to assert any claims against plaintiffs until some four years after the contract for sale was executed, Margaret was estopped from bringing her counterclaim. Finally, they asserted that Margaret "only ceased making payments pursuant to the terms of the contract and filed her Counter-Claim herein because [she] purchased her membership as an investment and later made the determination that it was a bad investment."

Following various developments not pertinent to our discussion, the circuit court entered summary judgment in favor of Margaret on her counterclaim. In its order, dated March 17, 1986, the court rejected each of plaintiffs' affirmative defenses and awarded Margaret the sum of $1,000, "the limit provided in the Federal Statute violated as a setoff against any judgment that might be rendered in favor of plaintiff[s], plus attorneys fees in an amount to be proved in regard to the counter-claim."

The following month, Margaret's attorney filed a petition with the

court in which he requested an award of $8,360 in fees for 104½ hours of work at $80 per hour, and $101.36 for out-of-pocket expenses. A hearing was held on this petition, and on July 29, 1986, the court ruled that Margaret was entitled to recover attorney fees of $6,861.36 "in addition to the prior announced judgment *** of $1,000 plus costs." Plaintiffs subsequently moved to vacate the court's order granting summary judgment and its attendant award of $1,000 and $6,861.36 in attorney fees. This motion was denied in all respects on December 2, 1986. At that time the court made an express written finding pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)) that "[t]here is no just reason for delaying appeal." This appeal ensued.

■■ ■ To assure meaningful disclosure of credit terms so that consumers can "readily compare the various credit options available to them," and to protect consumers against inaccurate and unfair credit billing and credit card practices, Congress has enacted the Truth in Lending Act (15 U.S.C.A. §1601 *et seq.* (West 1982)). (See *Lanier v. Associates Finance, Inc.* (1986), 114 Ill. 2d 1,11, 499 N.E.2d 440, 444.) Under the terms of the Act, the Federal Reserve Board has authority to prescribe regulations to carry out the Act's purposes. (15 U.S.C.A. §1604 (West 1982).) Pursuant to that authority, the Board has promulgated a comprehensive set of rules known as Regulation Z (12 C.F.R. §226.1 *et seq., reprinted in* 15 U.S.C.A. foll. §1700 (West 1982)). (*Lanier v. Associates Finance, Inc.* (1986), 114 Ill. 2d 1, 11, 499 N.E.2d 440, 444.) There is no dispute that a violation of Regulation Z is equivalent to a violation of the Act itself. (See, *e.g., Associates Finance, Inc. v. Cedillo* (1980), 89 Ill. App. 3d 179, 411 N.E.2d 1194; *American Buyers Club of Mt. Vernon, Illinois, Inc. v. Grayling* (1977), 53 Ill. App. 3d 611, 368 N.E.2d 1057.) Nor is there any dispute that the courts of this State have jurisdiction to enforce the Act. 15 U.S.C.A. §1640(e) (West 1982); *Household Finance Corp. v. Buck* (1982), 107 Ill. App. 3d 628, 629, 437 N.E.2d 425, 427.

■ Before proceeding with our discussion, we note that the Truth in Lending Act was amended by the Truth in Lending Simplification and Reform Act (Pub. L. No. 96—221, 94 Stat.168 (1980)) (TILSRA) on March 31, 1980, approximately six months before the contract at issue in this case was signed. With one exception not relevant here, however, the amendments made by the TILSRA did not take effect until the expiration of two years and six months after that legislation was enacted (Oct. 1, 1982). Although Congress provided that creditors could elect to comply with the TILSRA, rather than the prior legislation, before the effective date of the amendments (see 15 U.S.C.A. §1602, Historical Note (West 1982); *Cox v. First National Bank of Cin-*

*cinnati* (6th Cir. 1985), 751 F.2d 815, 821), plaintiffs do not purport to have made such an election here. Accordingly, the TILSRA has no application. The contract for sale at issue in this case must be examined in light of the requirements of the pre-TILSRA legislation as that legislation existed at the time the contract was executed (see 751 F.2d at 822; *Lanier v. Associates Finance, Inc.* (1986), 114 Ill. 2d 1, 12, 499 N.E.2d 440, 444), and all references to the Truth in Lending Act in this opinion are to that version of the statute.

■ We further note that Regulation Z was substantially revised effective April 1, 1981, approximately six months after the disputed contract was signed. Revised Regulation Z, however, implemented the TILSRA, not the prior version of the statute (see *Cox v. First National Bank of Cincinnati* (6th Cir. 1985), 751 F.2d 815, 820), and, as with the TILSRA, it did not become mandatorily effective until October 1, 1982. (*Lanier v. Associates Finance, Inc.* (1986), 114 Ill. 2d 1, 12, 499 N.E.2d 440, 444.) The law is clear that if the TILSRA applies to a transaction, then so too does revised Regulation Z. Correspondingly, if the pre-TILSRA legislation applies, then the former Regulation Z also applies. (*Cox v. First National Bank of Cincinnati* (6th Cir. 1985), 751 F.2d 815, 820.) A creditor may not comply in part with the old law and in part with the new law, but must instead comply in full with either the old or new law. (See 751 F.2d at 820-21.) Because, as we have indicated, plaintiffs here did not elect to follow the TILSRA and the pre-TILSRA legislation applies, we must therefore likewise conclude that the former Regulation Z governs this litigation.

■ ■ The Truth in Lending Act authorizes a civil cause of action by a consumer against a creditor who fails to comply with the requirements imposed by the statute. (15 U.S.C.A. §1640(a) (West 1982); *Tower v. Moss* (5th Cir. 1980), 625 F.2d 1161,1165.) It does not, however, provide "a remedy for breach of contract, designed to give the nonbreaching party the benefit of his bargain." (*Merchandise National Bank v. Scanlon* (1980), 86 Ill. App. 3d 719, 724, 408 N.E.2d 248, 252.) Rather, the basis for liability is the failure to disclose information required to be disclosed. 86 Ill. App. 3d at 724, 408 N.E.2d at 252.

■ ■ Creditors must meet a standard of strict compliance with the Act's disclosure requirements. A consumer need not have been deceived in fact for the Act to have been violated. (*Household Finance Corp. v. Buck* (1982), 107 Ill. App. 3d 628, 630, 437 N.E.2d 425, 427.) Once the court finds a violation, no matter how technical, it has no discretion with respect to imposition of liability for statutory penalties. (*Associates Finance, Inc. v. Cedillo* (1980), 89 Ill. App. 3d 179, 184, 411 N.E.2d 1194, 1199.) Where the Act or Regulation Z have been vio-

lated in cases such as this, the creditor must pay a penalty equal to twice the amount of the finance charge up to $1,000, but not less than $100 (15 U.S.C.A. §1640(a)(2)(A)(i) (West 1982)), plus costs and attorney fees (15 U.S.C.A. §1640(a)(3) (West 1982)). *Public Finance Corp. v. Riddle* (1980), 83 Ill. App. 3d 417, 422, 403 N.E.2d 1316, 1320; *Household Finance Corp. v. Buck* (1982), 107 Ill. App. 3d 628, 633, 437 N.E.2d 425, 430.

The Truth in Lending Act is not applicable to all credit transactions. The extension of credit for business or commercial purposes, for example, is exempted from coverage. (See 12 C.F.R. §226.3, *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982).) What the Act does cover are consumer credit transactions, *i.e.*, those "in which the party to whom credit is offered or extended is an actual person, and the money, property or services which are the subject of the transaction are primarily for personal, family, household, or agricultural purposes" (15 U.S.C.A. §1602(h) (West 1982); see also 12 C.F.R. §226.2(p), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982); *Tower v. Moss* (5th Cir. 1980), 625 F.2d 1161, 1166), involving creditors "who regularly extend, or arrange for the extension of, credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise" (15 U.S.C.A. §1602(f) (West 1982); see also 12 C.F.R. §226.2(s), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982)). Plaintiffs here do not deny that they are such creditors, and there is no question that the disputed contract for sale involved the extension of consumer credit.

Section 226.8(b)(7) of Regulation Z (12 C.F.R. §226.8(b)(7), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982)) requires creditors to make various enumerated disclosures "as applicable" in consumer credit transactions. Among these is:

> "Identification of the method of computing any unearned portion of the finance charge in the event of prepayment in full of an obligation which includes precomputed finance charges and a statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate of such unearned finance charge that will be credited to an obligation or refunded to the customer. If the credit contract does not provide for any rebate of unearned finance charges upon prepayment in full, this fact shall be disclosed."

As we have discussed, Margaret's counterclaim alleged that plaintiffs violated this provision in that the disputed contract for sale failed "to identify the method of computing any unearned portion of

the precomputed finance charge in the event of prepayment of the obligation." On this appeal, plaintiffs first argue that this provision is inapplicable and that the circuit court therefore erred in granting summary judgment for Margaret because the contract involved neither "precomputed finance charges" nor the imposition of any "unearned finance charge."

In support of this argument, plaintiffs explained that while the contract did list the total finance charge as being $2,388.64, they actually computed finance charges periodically each time a payment was received. The finance charge for any given period was determined by calculating the amount of interest which would be due on the principal balance outstanding at the time a payment was received at an annual rate of 11%, then dividing this figure by the fraction of a year which had passed since the loan originated in the case of the first payment and by the fraction of a year which had passed since the prior payment in the case of all successive payments. For example, when defendants made their first payment of $73.84 one month after the contract was executed, they owed $4,700 in principal. Plaintiffs computed the finance charge due for this first month by multiplying $4,700 by 11% and dividing the product by 12 (one month being $1/12$ of a year), yielding a figure of $43.08. This first month finance charge of $43.08 was then deducted from the $73.84 payment, and the difference, $30.76, was applied to reduce the principal. When each successive payment was received, the same procedure was followed.

Plaintiffs contend that the $2,388.64 finance charge stated on the face of the contract cannot be construed as a "precomputed finance charge" because plaintiffs were never obligated to pay the full amount of that charge. According to plaintiffs, the figure of $2,388.64 was provided merely to illustrate what the total periodic finance charges would be under the method of computation described above if defendants made equal payments of $73.84 each month for 96 months and did so in a timely fashion. They assert that defendants were, in fact, free to pay off the full principal at any time, and that because of the method of computation used, once the balance was so paid, no further finance charges would be imposed. Defendants would end up being liable only for the interest which they had accrued through the date of prepayment. For this reason, plaintiffs further contend that no part of the finance charge here could be considered "unearned."

The flaw in plaintiffs' analysis is that it overlooks the express terms of the contract for sale. Contrary to plaintiffs' claim that the $2,388.64 finance charge was not fixed and could be reduced by prepayment, the contract itself plainly states that "[t]he finance charge is

imposed as of the date of the Contract." Absent any further explanation of this clause in the document, we believe that it indicates that defendants were to be liable for the full amount of the finance charge as soon as the agreement was signed. Under these circumstances, the finance charge must be held to be a "precomputed finance charge" and a portion of this charge would necessarily be "unearned" if defendants elected to prepay the obligation in full. As a result, the disclosures specified in section 226.8(b)(7) of Regulation Z (12 C.F.R. §226.8(b)(7), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982)) regarding unearned finance charges were obligatory.

Such disclosures were not made. The agreement did say that "[t]he Member has the right to prepay the outstanding balance of this Contract in whole or in part at any time without penalty," but the issue of prepayment penalties is distinct from the question of how unearned finance charges will be handled in the event of prepayment. Indeed, prepayment penalties are treated in a separate provision of Regulation Z. See 12 C.F.R. §226.8(b)(6), *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982).

We recognize that by stating that the finance charge was "imposed as of the date of the Contract," plaintiffs may have intended to indicate simply that they would begin computing the periodic finance charges at that time. Such a construction is consistent with plaintiffs' contention that there was in fact no precomputed finance charge, but it is not apparent from the face of the contract. The principal case upon which plaintiffs rely is *Martinez v. Idaho First National Bank* (D. Idaho 1981), 509 F. Supp. 773, *rev'd on other grounds sub nom. Dixey v. Idaho First National Bank* (9th Cir. 1982), 677 F.2d 749. Even a cursory review of that case, however, shows that the finance charges there were explained in considerably more detail than they were here.

The only possible textual support for plaintiffs' claim that there was no precomputed finance charge is the reference noted above to prepayment penalties. Strictly speaking, one would not refer to prepayment penalties if the obligation were one containing a precomputed finance charge and subject to section 226.8(b)(7) of Regulation Z (15 U.S.C.A. foll. §1700 (West 1982)). According to an interpretation by the Federal Reserve Board, prepayment penalties are properly understood to be "charges assessed in connection with obligations which do not involve precomputed finance charges included in the obligation," but which involve instead computation of the finance charge "from time to time by application of a rate to the unpaid principal balance." (12 C.F.R. §226.818, *reprinted in* 15 U.S.C.A. foll. §1700 (West 1982).)

There being no further clarification in the body of the contract itself, however, we do not see how an ordinary consumer could possibly be expected to appreciate such technical distinctions. From the record, we are unsure of whether these distinctions were appreciated even by plaintiffs, one of whom is a lawyer.

In our view, the only legitimate argument that plaintiffs might be able to make about the terms of the contract is that they are ambiguous, but such a claim does not aid plaintiffs' position. As a general rule, all ambiguities in the disclosure instrument should be construed against the creditor, not only as the one upon whom the burden of compliance lies, but also as the one who drafted the disclosure statement. (*Associates Finance, Inc. v. Cedillo* (1980), 89 Ill. App. 3d 179, 184, 411 N.E.2d 1194, 1198.) More importantly, the purpose of a disclosure statement is to disclose as precisely and accurately as possible the terms of the credit transaction. To the extent that the statement unreasonably obscures, confuses or overstates the requisite information, it is violative of the Truth in Lending Act. 89 Ill. App. 3d 179, 184, 411 N.E.2d 1194, 1198.

Plaintiffs next assert that the trial court erred in granting summary judgment because, in so doing, it "effectively deprived [them] of their statutory right to present facts constituting a complete defense" to the counterclaim under sections 1640(c) and 1640(f) of the Truth in Lending Act (15 U.S.C.A. §§1640(c), (f) (West 1982)). This contention is wholly without merit.

Plaintiffs are apparently laboring under the belief that they were not required to substantiate, or even raise, their defenses under the foregoing provisions when Margaret moved for summary judgment. They suggest, instead, that Margaret should have been required to affirmatively establish not only that Regulation Z had been violated, as she did, but also that none of the statutory defenses under the Truth in Lending Act applied. This is simply not so. As a general rule, "when a motion for summary judgment is made, the opponent cannot sit quietly by but is required to raise any defenses and produce evidence tending to show a question of fact exists." (*Murphy v. Urso* (1980), 83 Ill. App. 3d 779, 795, 404 N.E.2d 287, 300, *affirmed in part and reversed in part on other grounds* (1981), 88 Ill. 2d 444, 430 N.E.2d 1079.) Moreover, at least with respect to the defense provided under section 1640(c) of the Act (15 U.S.C.A. §1640(c) (West 1982)), the statute expressly places the burden of proof on plaintiffs, the creditors, not Margaret.

The record before us indicates that plaintiffs had every opportunity to adduce by affidavit or otherwise facts pertinent to the statutory

defenses which they now claim to be determinative of this dispute. Yet, no such facts were adduced. Indeed, plaintiffs failed even to suggest the possible relevance of these particular defenses until after summary judgment had already been rendered against them.

Even if plaintiffs had properly pursued their statutory defenses, it would have been to no avail. Section 1640(c) of the Act (15 U.S.C.A. §1640(c) (West 1982)) provides:

> "A creditor may not be held liable in any action brought under this section *** for violation of this subchapter if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

■■■ The case law establishes that this provision is directed toward clerical-type mistakes. In fact, it is commonly referred to as establishing the "clerical error defense." As the terms of the statute plainly indicate, to invoke this defense plaintiffs would have had to first prove that the error in question was an unintentional, *bona fide* error, and second, that they maintained procedures reasonably adapted to avoid any such error. (*Associates Finance, Inc. v. Cedillo* (1980), 89 Ill. App. 3d 179, 186, 411 N.E.2d 1194, 1199; *McGowan v. King, Inc.* (5th Cir. 1978), 569 F.2d 845, 849-50.) In this case, however, plaintiffs have suggested no facts by which they could possibly have established either of these elements or, indeed, that their error was even the product of the type of clerical mistake which the provision is intended to cover.

What plaintiffs actually claim, and what they allege they were denied the opportunity to prove, is that they acted in "good faith." A good-faith defense is provided under section 1640(f) of the Act (15 U.S.C.A. §1640(f) (West 1982)), but that provision states:

> "No provision of this section, *** or section 1611 of this title imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals under such procedures as the Board may prescribe therefor ***."

As one court has recently held, this defense is, by its terms,

> "available to a creditor only if he acts 'in conformity' with certain official interpretations of the Truth in Lending Act. It does not protect a creditor who *fails* to conform with the regulation

or interpretation through an honest, good faith mistake. In other words, section 1640(f) does not protect a creditor from its own mistaken interpretation of the law. See *Valencia v. Anderson Brothers Ford*, 617 F.2d 1278,1287 (7th Cir. 1980), *reversed on other grounds*, 452 U.S. 205, 101 S. Ct. 2266, 68 L. Ed. 2d 783 (1981) ('[A] creditor's mistaken interpretation of Regulation Z, even if honest and reasonable, is not a defense under section 1640(f).'); *Kessler v. Associates Financial Services Co.*, 573 F.2d 577, 579 (9th Cir. 1977) ('Section 1640(f) creates no good faith defense based on the creditor's honest and reasonable, but mistaken interpretation of the Regulation Z.'); *Pearson v. Easy Living, Inc.*, 534 F. Supp. 884, 895 (S.D. Ohio 1981) ('Honest and reasonable' misinterpretation of official pronouncement 'is not a defense')." (Emphasis in original.) *Cox v. First National Bank of Cincinnati* (6th Cir. 1985), 751 F.2d 815, 825.

██ Despite plaintiffs' contention that section 1640(f) (15 U.S.C.A. §1640(f) (West 1982)) would provide a complete defense, they fail to identify any "rule, regulation, or interpretation" with which they acted "in conformity." As our previous discussion has shown, they certainly did not comply with Regulation Z. What they rely upon, instead, is that they attended various seminars and received numerous materials as members of the American Land Development Association "which they reviewed and used as a basis for drafting the contract in question." From this, we infer that they merely seek to assert that they were, at most, guilty of an honest mistake. Based upon the foregoing authorities, this is legally insufficient under section 1640(f).

██ Finally, plaintiffs argue that the trial court's award of $6,861.36 in attorney fees and expenses was excessive and unreasonable. The standards governing awards of attorney fees under the Truth in Lending Act were discussed at length in *Mt. Vernon Memorial Estates, Inc. v. Wood* (1980), 88 Ill. App. 3d 666, 410 N.E.2d 995, and need not be repeated here. (See also *Merchandise National Bank v. Scanlon* (1980), 86 Ill. App. 3d 719, 408 N.E.2d 248.) As noted in that case, "[t]he trial court has broad discretion in awarding attorney's fees under the [Truth in Lending Act], and its award will not be disturbed absent a showing of an abuse of that discretion." *Mt. Vernon Memorial Estates, Inc. v. Wood* (1980), 88 Ill. App. 3d 666, 669, 410 N.E.2d 995, 997.

Plaintiffs have established no such abuse of discretion in this case. Margaret's counsel submitted a detailed statement of his services, and a hearing was held regarding the reasonableness of the number of hours for which he sought compensation and of the hourly rate at

which he sought to be paid. At that hearing, argument and evidence were presented which addressed such matters as the skill and experience of Margaret's attorney, the nature and complexity of the case, the results obtained and awards made in other Truth in Lending Act cases. This was hardly a case in which the fee award was left to "conjecture or guess work." *Mt. Vernon Memorial Estates, Inc. v. Wood* (1980), 88 Ill. App. 3d 666, 669, 410 N.E.2d 995, 997.

Plaintiffs argue that Margaret's counsel should not have been compensated for certain hours included in his fee statement which pertained to an unsuccessful alternate theory of recovery and to his preparation for the hearing on the fee award. Without addressing the merits of this contention, we note simply that the court did reduce the fee requested by $1,600, more than the amount attributable to the challenged hours.

While plaintiffs suggest that the fee award granted by the trial court is so flagrantly unfair that it will "tarnish" the Truth in Lending Act, we adhere to the view that

"[t]he Act embodies the national policy that economic stablization and competition will be enhanced if consumers are given accurate and meaningful disclosure of credit. (15 U.S.C. §1601 (1970).) Enforcement of this policy was placed primarily on the private sector, through suits for civil penalties. A provision for attorney's fees helps assure that enforcement will take place. But such a provision is rendered meaningless unless attorneys for successful parties are given reasonably adequate compensation for their services. The need for adequate compensation is particularly important since the statutory penalty is limited to $1000." *(Merchandise National Bank v. Scanlon* (1980), 86 Ill. App. 3d 719, 730, 408 N.E.2d 248, 256.)

We believe that the fee award in this case is fully consistent with these principles and was within the bounds of the trial court's discretion.

For the foregoing reasons, the orders of the circuit court of Clinton County granting summary judgment for Margaret on her counterclaim and awarding her $1,000 plus costs and attorney fees of $6,861.36 are affirmed.

Affirmed.

WELCH and CALVO, JJ., concur.